## STOKES *v.* HUMPHRIES *et al.*

The court did not err in sustaining a general demurrer to the petition, it appearing that the plaintiff was not entitled to the relief sought, because he was bound by the terms of a written instrument and was not entitled to be relieved of the effects of such written instrument under the facts alleged in the petition.

No. 2516.     FEBRUARY 15, 1922.

Equitable petition. Before Judge Kent. Twiggs superior court. March 2, 1921.

The essential facts alleged in the petition brought by Stokes against Humphries and Waters are as follows: Stokes held an option on a tract of land belonging to the Napiers, for $30,000. Stokes found a party willing to pay $38,000 for the land, and was about to consummate a sale to him whereby he would realize a profit of some $8,000, when Humphries advised him that the land with its valuable timber was worth much more than that amount; that the timber alone was worth $45,000 above the cost of cutting, sawing and marketing. Stokes knew Humphries to be a man of wide experience in the sawmill and lumber business. Humphries proposed to Stokes to finance the proposition, offering to put in the money necessary to purchase the land from the Napiers. The Napiers were willing to accept $28,500.00, $10,000 to be in cash and the balance in two annual payments of $9,250 each. Humph-

ries proposed to make the first cash payment, and to put in active charge of cutting and sawing the timber one Waters, who was an expert sawmill man; that the three, Stokes, Humphries, and Waters would own each a one-third interest in the land; Humphries to reimburse himself for all sums paid to the Napiers from the sale of lumber obtained from the land; when fully reimbursed for such payments, the land would then belong jointly to Stokes, Humphries, and Waters. Humphries advanced the cash payment of $10,000.00 to the Napiers; whereupon the latter executed their warranty deed to Stokes. Stokes executed two promissory notes for $9,250.00 each in favor of the Napiers, for the balance of the purchase-price of the land, payable on October 4, 1920, and October 4, 1921, respectively. To secure the payment of these notes Stokes executed his deed to the land, conveying the same to the Napiers. Humphries then advising Stokes that the proper thing to do was for Stokes to execute a deed to him for the land, this was done; Stokes at the same time executing his promissory note to Humphries for $9,250, and expecting to receive from Humphries a paper embodying the agreement and understanding of the parties. Whereupon Humphries procured a named lawyer, in whom petitioner had the utmost confidence, to draw the necessary paper, petitioner also having great confidence in Humphries and believing that on account of their partnership and confidential relations Humphries would correctly inform the attorney who was to draw the paper as to the trade. The paper thus drawn and executed by Humphries was a bond for title, in which Humphries obligated himself to convey to Stokes a one-third undivided interest in the land upon the payment by Stokes of the two outstanding promissory notes given to the Napiers for $9,250 each, and the note given by Stokes to Humphries for $9,250. Stokes received from Humphries this bond for title, but did not read the same, supposing that it was a paper so drawn as to speak the agreement and understanding of the parties, to wit: that Humphries and Waters would begin promptly (this was in the fall of 1919) to place sawmills upon the land and proceed to convert the timber into lumber and sell the same, which at that time was very valuable, and when a sufficient quantity was sold to reimburse Humphries, not only for the cost of cutting, sawing, and marketing the same, but to pay off all indebtedness against the land, Humphries would then convey to

petitioner a one-third undivided interest in the land. Petitioner alleges that there was delay in placing sawmills on the land, although he urged Humphries and Waters to carry out their promise in this respect. At that time lumber was bringing high prices, and the delay was resulting in loss to petitioner. Becoming impatient with Humphries and Waters on account of the slow progress being made in cutting and sawing the timber, Stokes examined his bond for title, and found that the stipulation contained therein was to the effect that upon the payment by Stokes of all outstanding indebtedness against the land, consisting of the three promissory notes aggregating $27,750.00, a one-third undivided interest in the land would be conveyed to him by Humphries. Whereupon Stokes, setting forth these facts, alleged that the bond for title did not speak the understanding between him and the defendants, and that the same was a fraud perpetrated upon him; and he prayed that the notes which he had executed be surrendered and canceled; that Humphries be required to perform his obligation as to sawing the timber on the land at his own expense; for an accounting for all lumber sold and the expenses incident to cutting, sawing, and selling same; and for other relief. The defendants filed general and special demurrers, which were sustained by the court, and the petition was dismissed. To this ruling the petitioner excepted.

*Jordan & Moore* and *Walter DeFore,* for plaintiff.

*John R. L. Smith, Grady C. Harris,* and *R. A. Harrison,* for defendants.

FISH, C. J. (After stating the foregoing. facts). The note which was executed by Stokes, the plaintiff in error, to Humphries for $10,000, and the bond for title which Humphries then executed and delivered to Stokes, taken together, constituted a single contract in writing. While Stokes did not sign the bond for title, he did sign the note; and before he could have the right to submit oral evidence to vary or contradict the terms of the contract as contained in the writing, it would be necessary for him to show that the contract was obtained by fraud or executed by mistake relievable in equity. The two papers constituting one written contract, the maker of the note, who was the obligee in the bond, could not vary or contradict the terms of the bond so as to enlarge his rights or diminish his liabilities, without showing fraud upon

the part of the maker of the bond and the payee in the note in obtaining the signature to the note and the acceptance of the bond. And, according to the repeated rulings of this court, the fraud which would relieve a party who can read, under the circumstances set forth in the petition, must be fraud which prevents him from reading. " Equity will not reform a written contract because of mistake as to the contents of the writing on the part of the complaining party (who was able to read), and fraud of the other party which consists only in making false representations as to such contents, on which the complaining party relied as true because of confidence in the party making them, no fiduciary or confidential relation existing between the parties, and no sufficient excuse appearing why the complaining party did not read the contract." *Weaver* v. *Roberson,* 134 *Ga.* 149 (67 S. E. 662). There is no merit in the contention that Humphries and Stokes were partners, and that because of that fact such confidential relations existed between them as would relieve the complainant of the effects of his negligence in acquainting himself with the terms of the contract for the sale and conveyance of this land. The establishment of the contention of the plaintiff in error as to this question depends upon the effect of his efforts to eliminate the written contract so as to permit him to enter upon a consideration of prior negotiations which resulted in the written contract. If those prior negotiations had resulted in a written contract embodying what the plaintiff in error now contends was the real understanding between the parties, there might have been something in the contention that such confidential relations existed between them as would have excused him for relying upon statements made in the conduct of the business, and that would have justified him in expecting from Humphries the observance of that good faith which one partner owes to another. But when this transaction was made the two parties had not progressed to that extent in the formation of a partnership which would excuse either one of them for failing to exercise the ordinary diligence of business men in the signing of written instruments embodying the evidence of a consummation of negotiations leading up to an important business transaction. If the bond for title in this case contained a mistake, or if the plaintiff in error was in ignorance of its terms, or if it contained terms which enabled the obligor in the bond to

perpetrate an actual fraud, the mistake or fraud would have been apparent to one of ordinary intelligence upon a reading of the paper; but the plaintiff in error did not read it, it seems, and even alleges that he did not give it serious consideration. And, so far as appears from this petition, the complainant let a considerable time elapse before carefully considering the paper and ascertaining its contents; just how long a period of time he let elapse the pleader does not show — certainly does not show that he exercised any diligence in ascertaining the contents of the writing. It may be that the case is a hard one under the facts alleged, which are to be taken as true upon demurrer; but that does not authorize the court of equity to grant relief to one who failed entirely to exercise the diligence and prudence imposed by law upon one who seeks equitable relief.

It follows from what we have said, that the judgment sustaining the demurrer and dismissing the case must be affirmed.

*Judgment affirmed. All the Justices concur.*

ATKINSON, J., concurs in the judgment.